# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 7, 2006

## JOSEPH JACKSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. P-27485     Chris Craft, Judge**

---

**No. W2005-01181-CCA-R3-PC   -   Filed March 28, 2006**

---

The petitioner, Joseph Jackson, appeals the Shelby County Criminal Court's dismissal of his petition for post-conviction relief from his convictions for two counts of attempted first degree murder and resulting twenty-year concurrent sentences.  On appeal, the defendant claims that his convictions violate the Double Jeopardy provision of the federal constitution, that his indictments were constitutionally defective, and that he received the ineffective assistance of counsel.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Kamilah E. Turner, Memphis, Tennessee, for the appellant, Joseph Jackson.

Paul G. Summers, Attorney General and Reporter; Blind Akrawi, Assistant Attorney General; William L. Gibbons, District Attorney General; and Alanda Horne Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case relates to the petitioner's shooting at one victim, missing, and striking a passerby. This court provided the following account of the events on direct appeal:

> On February 3, 2000, there was a large altercation between a number of gang members and other students in the parking lot of the MAPCO Express convenience store (MAPCO) on Raines Road in southeast Memphis.  The altercation took place in the afternoon, about the time nearby schools were dismissing.  The defendant had a "run in" the previous day with some rival gang members and, according to his statements to police, had been threatened by them.  Due to that "run

in," it was fairly common knowledge in the community that there would be a fight at the MAPCO on February 3, thus there was quite a large crowd in the parking lot.

There is evidence that earlier on February 3, the defendant told his friend, Lydell Yarbrough, there would be an altercation later that day. Yarbrough brought a rifle to school and let the defendant know he had it. It is unclear if Yarbrough brought the rifle because of the potential altercation. The defendant then put it into his backpack and carried it throughout the school day. In order for the rifle to be carried in the backpack without detection, it had to be disassembled.

After school, as the crowd started assembling at the MAPCO, a number of fights broke out, including one between the defendant and Johnny Maxwell. According to at least two witnesses, a police officer and Johnny Maxwell, Maxwell "beat up" the defendant in a fight that lasted about a minute. At this time, the defendant was not carrying the rifle. The crowd at the MAPCO had grown quite large by this time.

Immediately after the fight between the defendant and Maxwell, the defendant walked to a nearby truck where two of his friends, including Yarbrough, were sitting. The police officer stated that Maxwell and his friends were taunting the defendant. The crowd had still not diminished. The defendant then grabbed or was handed the rifle, and walked back with the assembled rifle toward Maxwell. There are differing versions as to who assembled the rifle and whether Maxwell and his friends walked towards the defendant as the defendant walked to the truck or were simply still hanging around the MAPCO lot. Calmly, the defendant walked towards Maxwell, lifted the rifle, and fired one shot in an attempt to kill Maxwell. He missed Maxwell, but the bullet struck twelve-year-old Brittney Taylor, who was walking behind the crowd, in the side. She had to be airlifted to the hospital. The defendant then put the gun into the truck and was almost immediately apprehended by the off-duty police officer who had witnessed the scene. The defendant's two friends drove away from the scene in the truck but were pulled over a short distance from the MAPCO.

. . . .

The police officer testified that on February 3, 2000, he was off duty near the fight scene, although he was still in uniform. He said he noticed a large crowd at the MAPCO, with several different fights occurring. He went to the scene and broke up one of the fights. He said he saw the defendant arguing with two shirtless boys who were jumping up and down and "throwing" gang signs at him. The officer testified it appeared as though the defendant had been "gotten the better of." He then witnessed the defendant walk to a green truck and then walk back to the boys who had been taunting him, getting "pretty close" to them. The defendant then fired one shot at Maxwell and "casually" walked back to the truck and put the rifle in it. The officer stated the other two boys at the truck were laughing. After the defendant put the gun back in the truck, the officer testified that he immediately apprehended the defendant. He said the defendant looked "whipped," acted depressed, and said he did not mean to shoot the victim.

. . . .

Lydell Yarbrough, who had pending charges for attempted first degree murder for actions related to this case, testified to the following: He said the defendant told him on the day in question that, on the previous day, the defendant had an altercation with some other boys and was letting Yarbrough know that something might happen that day. Yarbrough testified he (Yarbrough) brought a rifle to school that day, a disassembled one that he was able to keep in his backpack. He told the defendant about the rifle, and the defendant then obtained it and kept it in the defendant's backpack. After school, they went to the MAPCO where a crowd was forming in anticipation of the fights they knew were coming. Yarbrough testified that a fight broke out between the defendant and Maxwell. At that time, the defendant did not have the gun; it was in a truck that Yarbrough and another friend were sitting in at the MAPCO parking lot. After the fight between the defendant and Maxwell ended, a fight Yarbrough said lasted about a minute, the defendant walked over to the truck and got the gun. He stated he believed the defendant had to reassemble the gun. The defendant then walked back to Maxwell and Maxwell's friends, and Yarbrough said he then heard a gunshot. Yarbrough commented that, after the fist fight, the defendant's demeanor was calm. He also testified that the State had not given him any deals to testify and that he was only trying to tell the truth.

-3-

. . . .

The final witness important for our analysis was Johnny Maxwell. Maxwell testified that he indeed had been in a fist fight with the defendant, one-on-one, that lasted a "few minutes." He stated there were other fights going on at the same time, but his fight with the defendant was just between the two of them. Maxwell admitted that he had beaten the defendant in the fight. He stated that about a minute after the fist fight, he turned to walk away, but saw the defendant walk to the truck, where he was handed the gun by his "partner." He stated he had not walked towards the defendant as the defendant went to the truck. According to Maxwell, the defendant walked to within "ten to fifteen" feet of him and fired the shot that ultimately hit and injured Brittney Taylor.

State v. Joseph Jackson, Jr., No. W2001-02779-CCA-R3-CD, Shelby County, slip op. at 1-4 (Tenn. Crim. App. Dec. 17, 2002), as corrected (Jan. 10, 2003). This court affirmed the petitioner's convictions and sentences.

On July 8, 2003, the petitioner filed a petition for post-conviction relief alleging that he received the ineffective assistance of counsel, that the indictments were constitutionally defective, and that his dual convictions violate Double Jeopardy. At the petitioner's hearing for post-conviction relief, he testified that his attorney never discussed with him his range for purposes of sentencing. He said his attorney only told him that his sentence for each count of the indictment would be between fifteen and sixty years. He said that his parents had hired a private investigator who had located and interviewed various witnesses and that his attorney failed to investigate the witnesses. The petitioner explained, for example, that one of the witnesses would have said that the victim with whom he had been fighting was heading in the petitioner's direction in a threatening manner.

The petitioner said his attorney failed to negate the prosecution's case on the element of premeditation, explaining that no evidence of premeditation existed in his case. He said his attorney coerced him into not testifying on his own behalf. The petitioner said he wanted to testify and explain to the jury that he was acting in self-defense. The petitioner said, however, that it was ultimately his decision. He said his attorney never explained to him the elements of the crime that the state would have to prove in order for the jury to find him guilty beyond a reasonable doubt.

On cross-examination, the petitioner said his attorney never explained to him that his sentencing range as a Range I, standard offender was fifteen to twenty-five years for each offense. The petitioner said that one of the witnesses who was not interviewed would have testified to issues regarding his lack of premeditation. Specifically, he said the witness would have testified that the petitioner had not reassembled the gun before shooting. The petitioner also said another witness, the victim who was shot, would have testified, if asked, that the other victim had taken his shirt off

after the initial fight and was running around and asking, "Where the dude at that hit me?" The petitioner said this testimony also would have negated the prosecution's case as to premeditation. The petitioner acknowledged that at the trial, the trial court asked him questions concerning his right to testify. He admitted telling the trial court that he made the decision not to testify.

Sandra McClarien testified that she was the petitioner's mother. She said she hired a private investigator on the advice of the petitioner's first attorney, who had to withdraw from the petitioner's case before trial because he was campaigning for judge. She said that the private investigator interviewed various witnesses and that the tape recordings of the interviews had been in possession of the first attorney.

The petitioner's trial attorney testified that he had informed the petitioner of the potential sentences he could receive if convicted. The attorney said he had reviewed transcripts of interviews from the witnesses located by the private investigator. He said that the petitioner's sister talked to him about a potential witness but that he was unable to locate the witness. The attorney said he discussed with the petitioner the potential problems with him taking the stand because he felt the petitioner could not effectively communicate. He said, however, that because passion was their best defense at trial, he felt the petitioner needed to testify. The attorney said that after the state presented its case-in-chief, he asked the petitioner, "Do you want to testify?" and that the petitioner responded, "No, I don't want to testify." The attorney maintained he never told the petitioner not to testify, but he said he did tell the petitioner his testifying would be dangerous unless he could effectively communicate and express himself.

On cross-examination, the petitioner's attorney said he did not pursue the witness's statement that Johnny Maxwell was coming toward the defendant because he said Mr. Maxwell did not have a gun at the time. The attorney said he told the defendant that the defendant had a right to appeal the decision of the Tennessee Court of Criminal Appeals to the Tennessee Supreme Court.

In its order denying the petitioner post-conviction relief, the trial court found that the petitioner's attorney's performance was not deficient, that the issue regarding the defective indictments was meritless because the petitioner had cited a statute having nothing to do with his case, and that this court had previously determined the Double Jeopardy issue.

On appeal, the petitioner contends that he received the ineffective assistance of counsel, that his indictments are constitutionally defective, and that his convictions violate Double Jeopardy. The state contends that the petitioner's attorney's performance was not constitutionally deficient and that this court previously determined the Double Jeopardy issue. The state does not respond to the petitioner's defective indictments issue.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed

questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness.  Id. at 457.

Initially, we note that the Post-Conviction Procedure Act may not be used to re-litigate issues that this court has "previously determined." See T.C. A. § 40-30-106(f), (h); see also Miller v. State, 54 S.W.3d 743, 747-48 (Tenn. 2001) (holding that an issue previously determined by this court "cannot be revisited in this post-conviction proceeding").  This court has previously determined that no Double Jeopardy problem existed for the petitioner's convictions.  Jackson, slip op. at 6-8.  The petitioner is not entitled to relief.

## I.  CONSTITUTIONALLY DEFECTIVE INDICTMENT

The petitioner contends his indictments are constitutionally defective and therefore void because they "fail to allege the requisite mental state 'knowingly' required by T.C.A. § 39-17-417(c)."  The state does not respond to this issue.

We note the petitioner has failed to include a copy of his indictments in the appellate record. However, we may take judicial notice of the petitioner's direct appeal record in this case.  See State ex rel. Wilkerson v. Bomar, 213 Tenn. 499, 505, 376 S.W.2d 451, 453 (Tenn. 1964).  The Shelby County Grand Jury returned two nearly identical indictments against the petitioner, the only difference being the named victim.  The indictment for the crime against the victim Johnny Maxwell states:

> THE GRAND JURORS of the State of Tennessee, duly selected, empaneled, sworn and charged to inquire for the body of the county of Shelby, Tennessee, upon their oath, present that:
>
> LYDELL RAMON YARBROUGH
> JOSEPH JACKSON, JR
>
> on February 3, 2000 in Shelby County, Tennessee, and before the finding of this indictment, did unlawfully attempt to commit the offense of First Degree Murder as defined in T.C.A. 39-13-202, in that they did unlawfully, intentionally, and with premeditation attempt to kill Johnny Maxwell in violation of T.C.A. 39-12-101, against the peace and dignity of the State of Tennessee.

Initially, we note that section 39-17-417(c) provides for penalties for the manufacture, delivery, sale, or possession with the intent to manufacture, deliver, or sell certain controlled substances.  It is, however, devoid of a definition of "knowing."  We also note that the state is not required to prove the mental state of "knowing" in a prosecution for attempted first degree murder.

See T.C.A. §§ 39-12-101; 39-13-202.  In any event, we discern no constitutional infirmities in the petitioner's indictments, and the petitioner is not entitled to relief on this issue.

## II.  INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends that he received the ineffective assistance of counsel.  He claims his trial attorney failed to investigate his case properly, failed to interview witnesses and develop their testimony for trial, and failed to discuss with him the potential range of sentence he would receive.  The state contends the petitioner's attorney's performance was not constitutionally deficient.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial.  Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993).  In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different."  Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.  The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution.  State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test.  See Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997).  The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.  The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different."  Id. at 694, 104 S. Ct at 2068.  "A reasonable probability means a probability sufficient to undermine confidence in the outcome."  Id.  Failure to satisfy either prong results in the denial of relief.  Id. at 697, 104 S. Ct. at 2069.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases.  Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973).  Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689, 104 S. Ct. at 2065.  Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance.  Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation.  See  DeCoster, 487 F.2d at 1201.

Concerning the petitioner's claim that his attorney's performance was constitutionally deficient, we note that a petitioner's failure to present the testimony of any witness that he claimed should have been at his trial is fatal to his complaints regarding his attorney's investigation and failure to call witnesses. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The record reflects that the petitioner failed to call at the post-conviction hearing any of the witnesses he claims a proper investigation by his attorney would have revealed. Regarding the petitioner's other arguments of ineffective assistance of counsel, we conclude the record does not preponderate against the trial court's finding that the petitioner's attorney's performance was not constitutionally deficient. The petitioner is not entitled to relief on this issue.

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE